# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

DONNIE GENE SIXKILLER,       )
          )
      **Plaintiff,**       )
          )
**v.**           )      **Case No. 14-CV-731-CVE-PJC**
          )
**CAROLYN W. COLVIN,**       )
**Acting Commissioner of the**       )
**Social Security Administration,**       )
          )
      **Defendant.**       )

## REPORT AND RECOMMENDATION

Claimant, Donnie Gene Sixkiller ("Sixkiller"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Sixkiller's applications for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  Sixkiller appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that he was not disabled.  This case has been referred to the undersigned.  For the reasons discussed below, the undersigned recommends that the Commissioner's decision be **AFFIRMED.**

### Claimant's Testimony

Sixkiller was 42 years old at the time of the hearing before the ALJ on April 2, 2013.  (R. 55).  He had graduated from high school, where he took special education classes.  (R. 57).  He testified that he was unable to read the newspaper.  *Id.*  Sixkiller said that he took job applications home for his mother to help him complete.  (R. 76).  He could make change at the

grocery store.  (R. 57).  Sixkiller testified that he quit working due to swelling in his arms and legs.  (R. 59).

Sixkiller testified that he experienced unpredictable episodes of gout flares in his knees, neck, shoulders, elbows, and hands.  (R. 63, 67-69, 73-74).  He explained that he experienced "little" flares and "big" flares.  (R. 82).  His little flares typically lasted between two and four days in duration and occurred about once a month.  (R. 83).  About three times a year, Sixkiller experienced a big flare, which lasted about a month in duration.  *Id.*  He had been prescribed medications, including steroids, for his symptoms.  (R. 66, 69-70).

Sixkiller testified that he was experiencing gout in his left knee at the time of the hearing.  (R. 66-67).  Gout caused Sixkiller's knees to swell, which made it difficult for him to walk.  (R. 67).  Sixkiller explained that walking at the hearing would cause his left knee to swell to twice its normal size.  *Id.*  He said that he would be unable to walk for two to four days due to the swelling.  *Id.*  He occasionally walked with a cane, but he used crutches and wore a knee brace during a bad flare.  (R. 67, 73).  Sixkiller would occasionally experience pain in both of his knees which would travel into his low back.  (R. 69).  When this happened, Sixkiller had difficulty getting out of bed.  *Id.*  Weather changes intensified the pain and swelling in Sixkiller's knees.  (R. 72).  Sixkiller occasionally experienced numbness in his feet, but he was uncertain what caused this.  *Id.*

Sixkiller testified that he experienced pain and swelling in his left shoulder that radiated into his neck.  (R. 63, 81-82).  Sixkiller described occasions of waking up in the morning and not being able to get out of bed due to a sudden onset of neck pain.  (R. 68).  When this happened, Sixkiller stated that his pain would last for one to three weeks.  (R. 68).  Sixkiller's neck pain made it difficult for him to turn his head.  (R. 68, 81).  Sixkiller said that he used positions such

2

as reclining in a chair or lying down, in addition to taking medication, to help with his pain.  (R. 68, 82).  He said that the reclining position helped him to relax and to get comfortable.  (R. 82).

Sixkiller testified that he was unable to work due to symptoms of posttraumatic stress disorder ("PTSD").  (R. 74).  He said that he experienced problems with depression, anxiety, concentration, and memory.  (R. 75-76).  He said that he could get lost in familiar places due to memory problems.  (R. 76).

Sixkiller had high blood pressure which was controlled by medication.  (R. 63-64).  Sixkiller was additionally prescribed cholesterol medication.  *Id.*  Sixkiller had been diagnosed with diabetes, which caused him to urinate frequently.  (R. 64-65).  He said that he had occasional problems getting to the restroom in time.  (R. 65-66).  Medications helped to controlled his symptoms.  (R. 64-65).  Following episodes of vomiting blood, Sixkiller testified that he had been diagnosed with gastroesophageal reflux disease ("GERD").  (R. 66).  He was prescribed medication that controlled his symptoms.  *Id.*

Sixkiller had difficulty sleeping due to pain and swelling.  (R. 79, 84).  Sixkiller typically slept six to eight hours at night and took about a one-hour nap during the day.  (R. 79).

Sixkiller testified that he could sit for about 30 minutes at a time.  (R. 71).  He estimated that he could walk about 55 steps before needing to stop.  (R. 71-72).  Sixkiller could stand for about 15 minutes before needing to sit.  (R. 71).  He reported difficulty reaching overhead during a gout flare.  (R. 74).  Sixkiller stated that he could buy a 50-pound bag of dog food and place it in a shopping cart if it was "real close."  (R. 71).  Repetitive lifting of heavy objects would cause his joints to swell.  (R. 84).  Sixkiller said that he could bend and touch his toes, but not during a gout flare.  (R. 69-70).  He reported difficulty squatting and getting back up.  (R. 70).  Sixkiller

reported difficulty climbing stairs.  (R. 70-71).  His home had three front entry steps, so he tried not to leave his house during a flare.  (R. 70).

Sixkiller was able to shop, cook, and clean the dishes.  (R. 76-77).  Sixkiller did not dust, sweep, mop, or do laundry.  *Id.*  Sixkiller had his driver's license and drove about six miles every week.  (R. 79-80).  He reported difficulty driving long distances due to swelling in his hands.  (R. 68).  He did not belong to any clubs, organizations, or church.  (R. 78).  Sixkiller's social activities included playing board games and watching television.  *Id.*  He enjoyed fishing, deer hunting, and looking for wild vegetables.  (R. 78-79, 83).  He was able to till his garden using a hand tiller.  (R. 78-79).

On February 13, 2008, Sixkiller presented to Salina Cherokee Nation Indian Clinic (the "Salina Clinic").  (R. 368).  Assessments included uncontrolled diabetes, new diagnosis.  *Id.*  Sixkiller was prescribed medication and was given a glucometer to monitor his blood sugar.  *Id.*  On May 8, 2008, Sixkiller's diabetes was noted as uncontrolled.  (R. 367).

On July 1, 2008, Sixkiller was seen for an eye examination at the Salina Clinic, and assessments were myopia and astigmatism.  (R. 366).

When seen at the Salina Clinic on August 13, 2008, diagnoses were "much improved" uncontrolled diabetes and hypercholesterolemia.  (R. 364).  On November 3, 2008, Sixkiller's diagnosis was uncontrolled diabetes.  (R. 363).  When he returned on November 13, 2008, Sixkiller was noted as "doing well."  (R. 362).  Sixkiller had no reported medication side effects. *Id.*  Diagnoses were uncontrolled diabetes and hypercholesterolemia.  (R. 364).

On January 15, 2009, Sixkiller presented to the emergency room at Claremore Indian Hospital (the "Claremore Hospital") for nausea, vomiting, and bowel problems.  (R. 295-97).  He was discharged that same day.  (R. 297).

4

At an appointment at the Salina Clinic on February 2, 2009, Sixkiller's diabetes was noted as "well controlled."  (R. 359).  Assessment from a diabetic eye examination that same day was uncontrolled diabetes.  (R. 360-61).

Chest x-rays completed on February 2, 2009, revealed moderate spondylosis of the thoracic spine.  (R. 417).

On February 18, 2009, was seen at the Claremore Hospital for a two-day onset of pain and swelling in his right foot.  (R. 293-94).  X-rays were taken, and assessments were retrocalcaneal spur; osteoarthrosis of tarsal and metatarsal joints; and diabetes.  (R. 293, 299-300).

Sixkiller was seen at the Salina Clinic on February 23, 2009 for complaints of nausea and vomiting.  (R. 357).  Sixkiller was given a prescription for Phenergan.  *Id.*

Sixkiller was treated at the Hastings Indian Medical Center in Tahlequah (the "Hastings Clinic") four times in March 2009 for a corneal abrasion.  (R. 310-12, 315-16).

On March 20, 2009, Sara K. Dye, M.D., examined Sixkiller for a right heel spur.  (R. 285-88).  Sixkiller reported that his feet were tired, painful, and occasionally swollen at the end of a work day.  (R. 286).  Sixkiller's work duties required him to stand on cement floors all day.  *Id.*  He explained that he had lost his job the day before and wanted to look for one where he did not have to stand for prolonged periods.  *Id.*  It appears that, on examination, Sixkiller had no swelling or redness in his legs or feet.  (R. 287).  Dr. Dye educated Sixkiller on diabetic foot care, and her assessment was work-related bilateral foot pain.  *Id.*

Appointment notes from May 14, 2009 and September 18, 2009, at the Salina Clinic reflect that Sixkiller's diabetes was controlled.  (R. 356).  Sixkiller was seen routinely at the

Salina Clinic for diabetic supplies and glucometer readings in 2009 and 2010.  (R. 341, 343, 346, 351, 355, 363).

On January 17, 2010, Sixkiller presented to the Salina Clinic for complaints of a four-day onset of headaches, nausea, and vomiting blood.  (R. 340).  Assessment was sinusitis.  *Id.* Sixkiller returned on January 27, 2010, for complaints of pain and swelling in his left knee.  (R 350).  Sixkiller also complained of pain in his hands.  *Id.*  Assessments were swollen left knee and gout.  *Id.*  He was prescribed medications.  *Id.*

Sixkiller was seen at the Salina Clinic for diabetes follow-up on February 22, 2010, and notes state Sixkiller was dieting and doing "great."  (R. 345).  Assessments were controlled diabetes, hypercholesterolemia, and gout.  *Id.*

On February 22, 2010, Sixkiller saw an optometrist for a diabetic eye examination.  (R. 347).  Diagnosis was controlled diabetes.  *Id.*

On May 4, 2010, Sixkiller was evaluated at the Hastings Clinic for blood in his stool.  (R. 307-08, 328).

When Sixkiller was seen at the Salina Clinic on August 5, 2010, his diabetes was noted as stable.  (R. 342).  Sixkiller reported experiencing occasional gout flares.  *Id.*  Diagnoses were controlled diabetes, hypercholesterolemia, and gout.  *Id.*

Sixkiller was seen at the Claremore Hospital on January 19, 2011 for complaints of nausea and vomiting blood.  (R. 289-92).  An upper GI test was performed and revealed gastroesophageal reflux.  (R. 298).  Sixkiller was assessed with GERD, and medications were prescribed.  (R. 289-92).

Sixkiller returned to the Salina Clinic on January 31, 2011 for diabetes follow-up.  (R. 339).  It was noted that diabetes and hypertension were "great."  *Id.*  Sixkiller reported taking

medication for GERD.  *Id.*  Assessments were diabetes; gout; hypertension; GERD; and gastritis.

*Id.*  Sixkiller saw a dietician that same day.  (R. 338).

On January 31, 2011, Sixkiller was seen at the Salina Clinic for a diabetic eye

examination.  (R. 337-38).  It was noted that Sixkiller's glycemic control was "good."  (R. 338).

Assessment was diabetes, no complication.  *Id.*

Sixkiller was seen at the Salina Clinic on March 24, 2011, for complaints of a two-week

onset of neck pain.  (R. 336).  He indicated that he had been cutting wood.  *Id.*  He reported that

he had been taking gout medication.  *Id.*  Assessment was neck pain, and he was prescribed

medication.  *Id.*

On May 13, 2011, Sixkiller was seen by Clinton R. Childs, M.D., at the Salina Clinic for

a two-day onset of pain, swelling, and redness in his left shoulder.  (R. 334-35).  Sixkiller

additionally complained of right foot pain.  *Id.*  On examination, Sixkiller's left shoulder was red,

swollen, and tender to touch.  (R. 334).  He reported experiencing monthly gout attacks.  (R.

334).  Dr. Childs' assessment was gout.  (R. 334).  Medications were refilled.  *Id.*

On June 9, 2011, Sixkiller saw Dr. Childs for swelling in his left knee and multiple joint

pains.  (R. 331).  Assessments were diabetes; gout; hypertension; GERD; and arthralgias.  (R.

332).  Medication was prescribed.  *Id.*

On July 22, 2011, Sixkiller was seen at the Salina Clinic for left shoulder pain and

continued left knee pain.  (R. 456-58).  Swelling caused tenderness and redness in his left knee.

(R. 456).  Sixkiller was unable to tolerate an ice pack due to pain.  *Id.*  Sixkiller reported that

swelling in his left knee traveled to his other joints, primarily his left shoulder and right knee.  *Id.*

Sixkiller reported not taking Allopurinol for about a month.  *Id.*  Left knee x-rays were performed

and showed no acute disease.  (R. 459-60).  Assessment was arthralgias.  (R. 457).

On August 29, 2011, Sixkiller was seen by Dr. Childs for complaints of a three-week onset of pain and swelling in his right foot.  (R. 453-55).  He reported that he had been using crutches since his pain began.    On examination, the top of Sixkiller's right foot was red and mildly tender to palpation.  (R. 454).  Sixkiller was assessed with diabetes; gout; hypertension; and GERD.  (R. 453-54).

On December 13, 2011, Sixkiller saw Dr. Childs for medication refill.  (R. 465-67, 492-94).  Dr. Childs noted that Sixkiller was "doing well."  (R. 465-67).  Dr. Childs additionally noted that Sixkiller had experienced "a swell" after being off of Allopurinol.  (R. 465).  Dr. Childs continued prior diagnoses and prescribed medication.  (R. 466).

On February 6, 2012, Dr. Childs noted that Sixkiller's blood sugar level was elevated and that he was taking his medication "intermittently."  (R. 487).  Assessments were diabetes; gout; hypertension; and GERD.  (R. 488).  Dr. Childs prescribed medication.  *Id.*  Also on February 6, 2012, Sixkiller saw a dietician.  (R. 485-86).  Sixkiller inquired about decreasing Metformin, and he was advised to continue it as prescribed.  *Id.*

On February 6, 2012, Sixkiller saw an optometrist at the Salina Clinic for a diabetic eye examination.  (R. 484).  Diagnosis was diabetes without complication.  (R. 484).  He returned on March 8, 2012 for a routine eye examination and diagnoses were myopia and astigmatism.  (R. 366).

On March 15, 2012, Sixkiller was seen at the behavioral health department at the Salina Clinic.  (R. 481-82).  Sixkiller reported feeling depressed about his physical condition.  (R. 481).  He explained that gout made it hard for him to do the outdoor activities that he enjoyed.  *Id.*  Sixkiller's affect was noted as blunted.  *Id.*  Assessment was anxiety disorder due to general medical condition.  (R. 482).

Sixkiller returned to the Salina Clinic for a therapy session on April 23, 2012.  (R. 479-82).  Sixkiller reported experiencing gout flares during which he was unable to walk or to use his arms.  (R. 479).  Sixkiller reported that he worried about his next attack.  *Id.*  Assessment was generalized anxiety disorder.  (R. 480).  Recommendations were individual therapy and group rheumatoid/pain management therapy.  *Id.*

On July 14, 2012, Sixkiller saw Dr. Childs for diabetes follow-up.  (R. 474-78).  Dr. Childs' assessment was controlled diabetes, and he prescribed medication.  (R. 475).

At a therapy session at the Salina Clinic on October 10, 2012, Sixkiller reported problems with anxiety and nervousness.  (R. 498-501).  Symptoms of excessive worry; restlessness; fatigue; difficulty sleeping; difficulty concentrating; irritability; and muscle tension were reported.  (R. 501).  He stated that he had experienced these symptoms most of his life.  *Id.*  Sixkiller reported that he did not like to be around people and crowds.  *Id.*  He was fearful of heights and did not like closed-in places.    Sixkiller reported problems with PTSD related to being hit by a car in 1992.  *Id.*  Diagnoses on Axis I[1] were PTSD and major depressive disorder.  (R. 502).  Sixkiller's Global Assessment of Functioning ("GAF")[2] was assessed as 67.  *Id.*

---

[1] The multiaxial assessment system "facilitates comprehensive and systematic evaluation."  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter referred to as DSM-IV).

[2] The GAF score represents Axis V of the multiaxial assessment system.  *See* DSM-IV at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning."  *Id.* at 32.  The GAF scale is from 1-100.  A GAF score between 21-30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas."  *Id.* at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Id.*  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning," and 51-60 reflects moderate symptoms or moderate difficulty in functioning.  *Id.*  Scores between 61-70 reflect "some mild symptoms" or "some difficulty" in functioning, but "generally functioning

On October 25, 2012, Sixkiller was seen by Dr. Childs for complaints of low back pain. (R. 505-07).  Dr. Childs noted that Sixkiller's diabetes was "very well controlled."  (R. 505). Sixkiller reported experiencing a recent gout flare.  *Id.*  Assessments were controlled diabetes; gout; hypertension; and GERD.  (R. 506).

On March 25, 2013, Dr. Childs noted that Sixkiller was "doing great."  (R. 517-19).  Dr. Childs' assessments were controlled diabetes; gout; hypertension; and GERD.  (R. 519). Prescriptions for Allopurinol; Atorvastatin; Indomethacin; Lisinopril; Metformin; Omeprazole; and Pioglitazone were written.  *Id.*

On March 25, 2013, Sixkiller was seen at the Salina Clinic for diabetic eye examination. (R. 523)*.*  Diagnosis was diabetes, no complication.  *Id.*

Agency consultant Johnson Gourd, M.D., completed a physical examination of Sixkiller on August 27, 2011.  (R. 421-27).  Sixkiller's complaint was gout.  (R. 421).  Sixkiller explained that he experienced pain in his feet that would travel up to his knees and to his shoulders.  *Id.* The results of Dr. Gourd's examination were normal.  (R. 424-27).  Dr. Gourd's assessment was gout, uncontrolled by history, and he wrote that there were no specific findings on examination. (R. 422).

Agency nonexamining consultant Joy Kelley, Ph.D., completed a Psychiatric Review Technique form dated August 30, 2011, finding that Sixkiller had no mental impairments.  (R. 429-42).  In the "Consultant's Notes" portion of the form, Dr. Kelley summarized a 5002 Special Education Questions form dated July 21, 2011, and noted Sixkiller's difficulty reading and

---

pretty well."  *Id.*  A score between 71 and 80 reflects symptoms that are transient and reactions to stressors with no more than slight impairment in functioning.  *Id.  See also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012).

spelling.  (R. 441).  Dr. Kelley noted that Sixkiller had no reported work problems related to his learning disabilities.  *Id.*  Dr. Kelley summarized the mental health aspects of Dr. Gourd's consultative examination and treating examinations in January and May 2011.  *Id.*  Dr. Kelley summarized Sixkiller's activities of daily living.  *Id.*  Her analysis was that there was no medically determinable mental impairment.  *Id.*

Nonexamining agency consultant James Metcalf, M.D., completed a Physical Residual Functional Capacity Assessment on September 14, 2011.  (R. 443-50).  Dr. Metcalf indicated that Sixkiller could perform work at the "light" exertional level.  *Id.*  In the section for narrative explanation, Dr. Metcalf wrote that the treating medical evidence showed a history of gout, osteoarthritis, calluses on his feet, foot pain, GERD, hypertension, and diabetes.  (R. 444-45). Dr. Metcalf referred to imaging and other treating examinations.  *Id.*  Dr. Metcalf briefly summarized Dr. Gourd's report, as well as Sixkiller's activities of daily living.  (R. 445).  Dr. Metcalf wrote that "pain is considered in further limiting this RFC."  *Id.*  Dr. Metcalf found no postural; manipulative; visual; communicative; or environmental limitations.  (R. 445-47).

### Procedural History

In June 2011, Sixkiller protectively filed his applications for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act. (R. 36, 183-92).  The applications were denied initially and on reconsideration.  (R. 112-17).  An administrative hearing was held before ALJ Gene M. Kelly on April 2, 2013.  (R. 50-94).  By decision dated April 22, 2013, the ALJ found that Sixkiller was not disabled.  (R. 36-45).  On October 1, 2014, the Appeals Council denied review.  (R. 1-6).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal.  20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[3] *See also Wall v. Astrue,* 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported

---

[3] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Wall*, 561 F.3d at 1052 (quotations and citations omitted).  Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Id.*

### Decision of the Administrative Law Judge

In his decision, the ALJ found that Sixkiller met insured status requirements through March 31, 2013.  (R. 38).  At Step One, the ALJ found that Sixkiller had not engaged in substantial gainful activity since his alleged onset date of January 1, 2009.  *Id.*  At Step Two, the ALJ found that Sixkiller had the following severe impairments: gout; diabetes; GERD; vision problems; hypertension; problems with his back, shoulders, neck, and hands; depression; anxiety; PTSD; and borderline intellectual functioning.  *Id.*  At Step Three, the ALJ found that Sixkiller's impairments, or combination of impairments, did not meet any Listing.  (R. 38-40).

The ALJ found that Sixkiller had the RFC to perform a range of light work with several additional postural, manipulative, and environmental limitations.  (R. 40).  The ALJ included a statement that Sixkiller would "find it necessary to alter position from time to time to relieve his symptomatology."  *Id.*  For mental limitations, the ALJ said that Sixkiller could do simple, repetitive, and routine work and that he was limited to slight (brief and cursory) contact with the public.  *Id.*  At Step Four, the ALJ found that Sixkiller could not return to past relevant work.  (R. 43).  At Step Five, the ALJ found that there were a significant number of jobs in the national economy that Sixkiller could perform, taking into account his age, education, work experience,

and RFC.  (R. 43-44).  Therefore, the ALJ found that Sixkiller was not disabled at any time from

January 1, 2009 to the date of his decision.  (R. 45).

### Review

Sixkiller makes three arguments.  First, he argues that the ALJ's RFC was unsupported

by substantial evidence, and he makes several points under this broad heading.  Plaintiff's

Opening Brief, Dkt. #12, pp. 1-6.  Second, he argues that the ALJ failed to fulfill his duty to

develop the record.  *Id.*, pp.6-8.  Finally, Sixkiller argues that the Commissioner did not sustain

her burden at Step Five.  *Id.*, pp. 8-10.  Regarding the issues raised by Sixkiller, the undersigned

finds that the ALJ's decision is supported by substantial evidence and complies with legal

requirements.  The undersigned therefore recommends that the ALJ's decision be **AFFIRMED**.

### RFC Issues

Sixkiller makes several points relating to his broad argument that the ALJ's RFC

determination was not supported by substantial evidence.  He begins with an argument that the

undersigned has seen from plaintiff's counsel on multiple occasions.  Sixkiller asserts that the

ALJ did not take into account his own finding, in connection with Step Three, of moderate

difficulties with concentration, persistence or pace.  Plaintiff's Opening Brief, Dkt. #12, p. 2.

The undersigned has repeatedly explained to counsel that the four Paragraph B Criteria used at

Step Three do not necessarily require specific corresponding limitations in the ALJ's RFC.  *See,*

*e.g., Wilde v. Colvin*, 2014 WL 8106123 *4 (N.D. Okla.).  The Tenth Circuit has explained this

difference to counsel.  *See, e.g., Bales v. Colvin*, 576 Fed. Appx. 792, 797-98 (10th Cir. 2014)

(unpublished) (a "finding of a moderate limitation in concentration, persistence, or pace at step

three does not necessarily translate to a work-related functional limitation for the purposes of the

RFC assessment"); *Lull v. Colvin*, 535 Fed. Appx. 683, 685-86 (10th Cir. 2013) (unpublished)

(explaining difference between the four Paragraph B Criteria on the Psychiatric Review Technique form and the twenty specific mental functions addressed on a Mental Residual Functional Capacity Assessment).

Here, it is clear that substantial evidence supported an RFC with no mental limitations. Agency nonexamining consultant Dr. Kelley found that Sixkiller had no mental impairments. (R. 429-42).  Part of Dr. Kelley's reasoning was that Sixkiller had reported no work problems related to the learning disabilities that Sixkiller had experienced in school.  (R. 441).  The ALJ noted that Sixkiller had been able to perform semi-skilled work.  (R. 42).  The ALJ significantly tempered Dr. Kelley's opinion in favor of Sixkiller by adding some mental limitations.  (R. 40). Even though he tempered Dr. Kelley's opinion in favor of Sixkiller, it remained substantial evidence supporting his RFC determination.  *Chapo v. Astrue*, 682 F.3d 1285, 1287-88 (10th Cir. 2012) (no error by ALJ in relying on opinion of examining consultant and tempering the opinion in favor of claimant).  Under these circumstances, Sixkiller's argument that more mental limitations should have been included in the ALJ's RFC determination is unfounded.

For his second point in this section of his brief, Sixkiller argues that there was error in the ALJ's inclusion of a provision that "[t]he claimant, while functioning at the sedentary and light level, [] will find it necessary to alter position from time to time to relieve his symptomatology." Plaintiff's Opening Brief, Dkt. #12, pp. 2-3.  Sixkiller argues that this provision is not specific enough, citing to two unpublished Tenth Circuit cases that relied on Social Security Ruling 96-9p, 1996 WL 374185, *7.  *Maynard v. Astrue*, 276 Fed. Appx. 726, 731 (10th Cir. 2007) (unpublished); *Vail v. Barnhart*, 84 Fed. Appx. 1, 4-6 (10th Cir. 2003) (unpublished).  The Tenth Circuit in both *Maynard* and *Vail* noted that SSR 96-9p stated that an RFC must be specific as to the frequency of the individual's need to alternate sitting and standing.

15

The undersigned finds that Sixkiller's case is similar to a recent Tenth Circuit unpublished decision that found no reversible error. *Wahpekeche v. Colvin*, 2016 WL 537248 *3 (10th Cir.) (unpublished). Here, the ALJ found that Sixkiller could stand and/or walk six hours and sit six hours in an eight-hour workday "all with normal breaks." (R. 40). Later in his RFC determination, the ALJ said that while Sixkiller would be functioning at the sedentary and light level, he would "find it necessary to alter position from time to time to relieve his symptomatology." *Id.* The court in *Wahpekeche* noted that it was questionable whether the requirement of SSR 96-9p applied to the claimant's RFC for light work, and the undersigned finds that the specified language of SSR 96-9p applies only to sedentary work. The ruling's title states that it addresses an RFC for less than the full range of sedentary work. SSR 96-9p, 1996 WL 374185, *7. The ruling also explains that the sedentary occupational base will be eroded by a sit-stand option, and that the extent of the erosion will "depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand." *Id.*

In addition to the inapplicability of the ruling because the ALJ in Sixkiller's case found that he could do a range of both sedentary and light work, the undersigned agrees with the Commissioner that the vocational expert (the "VE") here had adequate information regarding Sixkiller's needs in order to testify regarding jobs available at Step Five. Sixkiller had testified that he could sit for about 30 minutes and stand for about 15 minutes before needing to change positions. (R. 71). The VE was present for this testimony, and the ALJ included in his hypothetical questions to the VE that the claimant would "find it necessary to alter position from time to time to relieve the symptomatology." (R. 87-90). As the Commissioner suggests, the undersigned finds that the VE, in response to the ALJ's question, would have interpreted

Sixkiller's need to alter position from time to time in light of Sixkiller's testimony.  Thus, because the ruling does not apply to Sixkiller's case, and because the VE had specific information regarding Sixkiller's need to alter positions, there is no reversible error related to the ALJ's inclusion of this provision in his RFC determination.

Next, Sixkiller argues that the ALJ, in addition to limiting his interaction with the public, should have limited his ability to interact with coworkers and supervisors.  Plaintiff's Opening Brief, Dkt. #12, pp. 3-4.  This argument fails because, as discussed above, there was substantial evidence that supported the inclusion of no mental limitations because agency nonexamining consultant Dr. Kelley found that Sixkiller had no mental impairments.  (R. 429-42).  *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (nonexamining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination); *Franklin v. Astrue*, 450 Fed. Appx. 782, 790 (10th Cir. 2011) (unpublished) (RFC assessment of agency nonexamining physician was substantial evidence supporting ALJ's conclusion); *Barrett v. Astrue*, 340 Fed. Appx. 481, 485 (10th Cir. 2009) (unpublished) (ALJ was entitled to rely upon opinion of nonexamining psychiatrist).  Even though he tempered Dr. Kelley's opinion in favor of Sixkiller, it remained substantial evidence supporting his RFC determination.  *Chapo*, 682 F.3d at 1287-88.  The ALJ was not required to temper Dr. Kelley's opinion even more by limiting Sixkiller's interaction with coworkers and supervisors.  This is especially true given Sixkiller's answer to the ALJ's question regarding whether he had problems getting along with people: "Not really, sir."  (R. 76).

Sixkiller's next argument is similarly unavailing, because it overstates the import of part of the report of Dr. Gourd, the agency examining consultant.  Plaintiff's Opening Brief, Dkt. #12, p. 4.  Sixkiller argues that the ALJ ignored an opinion by Dr. Gourd that Sixkiller needed to use a

cane.  *Id.*  In fact, the statement from Dr. Gourd was an observation rather than an opinion, in

that he noted that Sixkiller had a stable and steady gait with the use of a cane.  (R. 422).  *See*

*Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008) (a "true medical opinion" was one

that contained a doctor's "judgment about the nature and severity of [the claimant's] physical

limitations, or any information about what activities [the claimant] could still perform").  There

is nothing about Dr. Gourd's statement that implies that he found that Sixkiller needed a cane to

walk.  Dr. Gourd noted that on examination he found no indications of gout such as swelling or

tenderness to palpation.  (R. 422).  Under these circumstances, the ALJ was not required to

include a need for a cane in his RFC determination.

Sixkiller's next argument is that the ALJ was required to include a vision limitation

because he found that Sixkiller had "problems with vision" at Step Two.  Plaintiff's Opening

Brief, Dkt. #12, pp. 4-5.  Again, Sixkiller's argument is not supported by evidence, because when

asked if he had problems with his vision at the hearing, he said that his glasses corrected his

vision to 20/20.  (R. 63).  Perhaps the ALJ erred by including vision problems in the list of

impairments at Step Two, but if so, it was an error in Sixkiller's favor, and it caused no harm to

him.  Contrary to Sixkiller's argument, the ALJ was not required to include vision limitations in

the RFC when there was no evidence to support those limitations.  *Johnson v. Colvin*, 2016 WL

521081 *5 (10th Cir.) (unpublished) (ALJ is required to include in a hypothetical inquiry to the

VE all *and only* those impairments the ALJ properly finds borne out by the evidentiary record).

Sixkiller states that the ALJ erred by failing to limit his ability to stand and walk because

of his testimony regarding severe swelling.  Plaintiff's Opening Brief, Dkt. #12, p. 5.  Obviously,

the ALJ was not required to find that Sixkiller's testimony regarding the severity of his swelling

was credible in supporting a more severe limitation to his ability to walk and/or stand.  The

ALJ's RFC is supported by the opinion evidence of Dr. Metcalf, the nonexamining agency

consultant who found that Sixkiller could perform light work. *Flaherty*, 515 F.3d at 1071

(nonexamining consultant's opinion was an acceptable medical source which the ALJ was

entitled to consider and which supported his RFC determination).

At this point in his arguments attacking the ALJ's RFC determination, Sixkiller appears

to make a truncated credibility argument, stating that "the ALJ relied solely on the objective

medical evidence and Plaintiff's activities of daily living as purportedly inconsistent with

Plaintiff's allegations of disability." Plaintiff's Opening Brief, Dkt. #12, pp. 5-6. Sixkiller's

failure to fully develop a credibility argument makes it difficult for the undersigned to address

this portion of his brief. *See, e.g., Wall*, 561 F.3d at 1066 (claimant's argument at the district

court was "perfunctory" and deprived that court of the opportunity to analyze and rule).

Credibility determinations by the trier of fact are given great deference. *Hamilton v.*

*Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical
> abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must

give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68

F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186. "[C]ommon

sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary*, 695 F.3d at

1167.

Even if Sixkiller has not waived his credibility-related arguments by failing to adequately

develop them, the undersigned is persuaded that the ALJ's credibility assessment is sufficient.

Sixkiller's first argument appears to be that the ALJ relied too heavily upon his activities of daily living in finding that Sixkiller was less than fully credible.  Plaintiff's Opening Brief, Dkt. #12, p. 5.  The undersigned finds that the ALJ properly considered Sixkiller's activities without overly emphasizing them or describing them in a misleading fashion.  (R. 41-42).  Sixkiller's activities of daily living were a factor supporting the ALJ's adverse credibility assessment.  *Hendron v. Colvin*, 767 F.3d 951, 956 (10th Cir. 2014) (ALJ properly considered the claimant's activities as part of his credibility assessment); *Newbold v. Colvin*, 718 F.3d 1257, 1267 (10th Cir. 2013).

Sixkiller then states that the "ALJ's reliance on a purported lack of objective medical evidence is also without merit."  Plaintiff's Opening Brief, Dkt. #12, pp. 5-6.  The undersigned finds that the ALJ's discussion of the objective medical evidence was proper and that it supported the ALJ's credibility assessment because many of the findings supported the lack of severity of Sixkiller's symptoms.  A finding that subjective complaints are inconsistent with objective medical evidence is a legitimate reason that supports an adverse credibility assessment. *Newbold*, 718 F.3d at 1267.  Here, the ALJ noted the treating evidence that supported Sixkiller's claims of problems with his feet in 2009.  (R. 41).  He then said that he gave great weight to Dr. Gourd's consultative examination report, which essentially found no significant physical problems on examination of Sixkiller.  (R. 41-42).  He then noted a treatment record from October 2012 when Sixkiller had complained of a recent gout flare.  (R. 42).  After noting all of this objective medical evidence that supported some, but not all, of Sixkiller's claims regarding his joint pain, the ALJ then said that there were no opinions that Sixkiller had a more restrictive RFC than the RFC finding of the ALJ.  (R. 42).  He then said that his RFC was supported by the opinions of the agency consultants.  (R. 42-43).  All of this discussion was proper and supportive of his credibility assessment.

Finally, Sixkiller devotes two sentences to a mention of the ALJ's failure to discuss all of the factors required by Social Security Ruling 96-7p, 1996 WL 374186 *3, citing *Luna v. Bowen*, 834 F.2d 161, 165-66 (10th Cir. 1987).  Plaintiff's Opening Brief, Dkt. #12, p. 6.  The Tenth Circuit has recognized many times that an ALJ is not required to perform "a formalistic factor-by-factor recitation of the evidence."  *Wahpekeche*, 2016 WL 537248 *2, *quoting Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  The Tenth Circuit in *Wahpekeche* approved of the ALJ's discussion of the frequency and effectiveness of medical treatment, inconsistencies between the claimant's allegations and the medical records, and reports of the claimant's activities of daily living.   The ALJ's discussion here was similarly adequate, and the undersigned therefore recommends that the ALJ's decision be affirmed.

The ALJ's RFC determination was supported by substantial evidence and there were no legal errors that require reversal.  Therefore, the undersigned recommends that the ALJ's RFC determination be affirmed.

**Duty to Develop Record**

An ALJ "has a basic duty of inquiry to fully and fairly develop the record as to material issues."  *Baca v. Department of Health and Human Servs*., 5 F.3d 476, 479-80 (10th Cir. 1993). The Tenth Circuit considered the ALJ's duty to develop in the context of the ALJ's discretion to order consultative examinations in *Hawkins v. Chater*, 113 F.3d 1162, 1166-70 (10th Cir. 1997). The court in *Hawkins* noted that the ALJ has broad latitude in ordering consultative examinations.  *Id.* at 1166.  The "broad latitude" standard has been reaffirmed by the Tenth Circuit in multiple unpublished decisions in recent years.  *See, e.g., Duncan v. Colvin*, 608 Fed. Appx. 566, 570-72 (10th Cir. 2015) (unpublished)*; Lundgren v. Colvin*, 512 Fed. Appx. 875

(10th Cir. 2013) (unpublished); *Harlan v. Astrue*, 510 Fed. Appx. 708 (10th Cir. 2013)

(unpublished).

Sixkiller's case is not one that shows that the ALJ abused his broad latitude by failing to

order additional consultative examinations or testing.  First, Sixkiller states that the ALJ should

have ordered a "mental consultative examination in order to assess his psychological condition,

including his intellectual and mental functioning."  Plaintiff's Opening Brief, Dkt. #12, p. 6.  In

his decision, the ALJ summarized Sixkiller's testimony that he had attended special education

classes in school and that he had a limited ability to read.  (R. 41).  The ALJ noted 1990 IQ

testing, when Sixkiller was 16 years old, showing a full scale IQ of 76, plus or minus 6 points.

(R. 42).  He then specifically addressed Sixkiller's request for additional IQ testing, and he found

that the testing was not necessary.  *Id.*  He found that the evidence in the record did not support a

finding of onset of the impairment before age 22, which is required by Listing 12.05C.  *Id.*  He

also found that Sixkiller had been able to perform semi-skilled work as an adult.  *Id.*  Due to

these facts, the ALJ said that additional testing would not be helpful in assessing Sixkiller's RFC.

*Id.*

Sixkiller also argues that the ALJ should have ordered a consultative examination

regarding his mental functioning because the ALJ included depression, anxiety, PTSD, and

borderline intellectual functioning as severe impairments at Step Two.  Plaintiff's Opening Brief,

Dkt. #12, p. 7.  As discussed above, the ALJ's decision was supported by Dr. Kelley's opinion

that Sixkiller had no mental impairments, even if the ALJ then tempered that opinion in favor of

Sixkiller by including mental impairments at Step Two and mental limitations in his RFC

determination.  *Chapo*, 682 F.3d at 1287-88.  Under the circumstances of Sixkiller's case, the

ALJ did not violate his broad latitude by declining to order additional mental testing or evaluation.

Sixkiller also argues that the ALJ should have ordered a second complete physical consultative examination, and he bases this argument on a statement made by Luther Woodcock, M.D., an agency nonexamining consultant.  Plaintiff's Opening Brief, Dkt. #12, p. 8.  The undersigned agrees with the Commissioner that Dr. Woodcock's statement does not support Sixkiller's argument.  On a Case Analysis form dated January 9, 2012, Dr. Woodcock noted that Sixkiller had alleged that his joint pain had worsened, and Sixkiller had been seen at the Salina Clinic in November 2011.  (R. 470).  Dr. Woodcock then said that if the agency was unable to get medical evidence of record dated after September 2011, then the agency would "need to purchase a current, complete exam."  *Id.*  Dr. Woodcock then completed a much more extensive Case Analysis form dated January 17, 2012, in which he reviewed recent medical evidence of record, including a December 13, 2011 office visit at the Salina Clinic.  (R. 471).  Dr. Woodcock stated that he had reviewed all of the medical evidence and that he affirmed Dr. Metcalf's RFC assessment dated September 14, 2011.  *Id.*  He specifically said that the December 2011 Salina Clinic office visit did "not have findings that would significantly change" the RFC assessment of Dr. Metcalf.  *Id.*  This evidence shows that Dr. Woodcock was conscientious in reviewing Sixkiller's file, and it does not support Sixkiller's argument that a new physical consultative examination was required.

There were no legal errors relating to the ALJ's duty to develop the administrative record, and the undersigned therefore recommends that the ALJ's decision be affirmed.

**Step Five Issues**

Sixkiller makes several arguments related to Step Five.  Plaintiff's Opening Brief, Dkt. #12, pp. 8-10.  At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account her age, education, work experience and RFC.  *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999).  The ALJ is allowed to do this through the testimony of the VE.  *Id.* at 1089.   Sixkiller argues that the VE's testimony was in conflict with the Dictionary of Occupational Titles (the "DOT").  An ALJ must elicit testimony from a VE regarding whether the VE's testimony conflicts with the DOT. *Haddock*, 196 F.3d at 1089-92.  If there is a conflict, the ALJ must investigate it and elicit a reasonable explanation for the conflict before he can rely on the testimony of the VE.  *Id.* at 1091-92.  Here, the VE testified that his testimony was not in conflict with the DOT.  (R. 92).

First, Sixkiller argues that several of the jobs identified by the VE could not be performed by him because the DOT specifies that they required frequent or constant reaching.  Plaintiff's Opening Brief, Dkt. #12, p. 8.  The Commissioner, however, correctly explains that the ALJ's RFC limited Sixkiller only to occasional overhead reaching, rather than to occasional reaching.  (R. 40).  Because overhead reaching is obviously a subset of more general reaching, there is no reason to find that the VE's testimony, that Sixkiller could perform jobs that required frequent or constant reaching, was erroneous because it was in conflict with the DOT.  *See also Thompson v. Colvin*, 551 Fed. Appx. 944, 949 (10th Cir. 2014) (unpublished) (Tenth Circuit would not evaluate reaching requirements of jobs when the VE had testified that his testimony was in accordance with the DOT).

Regarding one of the jobs identified by the VE, Sixkiller says that its requirement of constant handling would prohibit him from performing it due to the slight limitation in finger,

feel, and grip that the ALJ's included in his RFC.  Plaintiff's Opening Brief, Dkt. #12, p. 9.

Sixkiller complains that the ALJ did not define what he meant by this "slight" limitation, but as

the Commissioner points out, the ALJ did define it in his hypothetical to the VE: "Slight

limitation in finger, feel and grip.  I'm not saying they can't use their hands and fingers, but they

shouldn't be doing extensive amounts of small, tedious tasks with their hands and fingers,

including clip fastening, working with small nuts and bolts."  (R. 89).  Sixkiller's argument

regarding this one job is not persuasive, given the ALJ's specific hypothetical and the VE's

testimony that he did not deviate from the DOT.

Finally, Sixkiller objects to some of the jobs identified by the VE because they required

the use of machinery or foot pedals.  Plaintiff's Opening Brief, Dkt. #12, pp. 9-10.  The ALJ

limited Sixkiller to only occasional operation of foot controls and he said that Sixkiller should

avoid "fast/dangerous" machinery.  (R. 40).  The Commissioner points out that the DOT

description of the jobs that are the focus of this portion of Sixkiller's argument describe

machinery, but do not describe that machinery as fast or dangerous.  Regarding the food pedal

argument, the Commissioner says that the DOT description of that one job is not in conflict with

occasional operation of foot controls.  Commissioner Brief, Dkt. #17, p. 10.  Again, the VE

testified that he did not deviate from the DOT, and the undersigned sees nothing in Sixkiller's

arguments that contradicts that testimony.

The Step Five finding by the ALJ remains supported by substantial evidence in the form

of the testimony of the VE.  No legal errors require reversal.  Therefore, the undersigned

recommends that the ALJ's Step Five finding be affirmed.

### Conclusion

The ALJ's decision is supported by substantial evidence and complies with legal requirements.  Based on the foregoing, the undersigned recommends that the decision of the Commissioner denying disability benefits to Claimant be **AFFIRMED.**

### Objections

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), a party may file specific written objections to this Report and Recommendation, but must do so by March 9, 2016.  If specific written objections are timely filed, the District Judge assigned to this case will make a *de novo* determination in accordance with Rule 72(b).  A party waives District Court review and appellate review by failing to file objections that are timely and sufficiently specific (the "firm waiver rule").  *Moore v. Astrue*, 491 Fed. Appx. 921, 923 (10th Cir. 2012) (unpublished), *citing In re Key Energy Res., Inc.*, 230 F.3d 1197, 1200-01 (10th Cir. 2000).

Dated this 24th day of February 2016.

Paul J. Cleary
United States Magistrate Judge